**FOR THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**JACKSON DIVISION**



A.M., by and through his next friend, Jeanette
Murry; on behalf of himself and all other persons
similarly situated,

                Plaintiff,

v.

JACKSON PUBLIC SCHOOLS BOARD OF
TRUSTEES, in its official capacity; DR. LONNIE
J. EDWARDS, SR., in his official capacity as
Superintendent at Jackson Public Schools;
GLENN DAVIS, in his official capacity as
Director of Security at Jackson Public Schools
MARIE HARRIS, in her official capacity as
Principal at Capital City Alternative School;
BOBBY WALDEN, in his official capacity as
Vice Principal at Capital City Alternative School;
FRANKLIN MCKEE, in his official capacity as
school safety officer at Capital City Alternative
School; STACEY GREENWOOD, in her official
capacity as school safety officer at Capital City
Alternative School,

                Defendants.

Case No. 3:11CV 344 TSL-mTP

## COMPLAINT

1.  This civil rights action is filed pursuant to 42 U.S.C. § 1983 to protect Jackson Public

Schools students from Defendants' policy, custom and practice of inflicting unreasonable, abusive

and excessive physical restraints on its students. Jackson Public School District (hereinafter "JPS"

or "Jackson Public Schools") officials subject students to brutal punishment that consists of

shackling and handcuffing children to railings and leaving them unsupervised for up to six hours at

a time. Frequently, students are forced to eat their lunches while restrained and must beg JPS staff

to release them to use the restroom. Children are forced to endure this abusive and excessive restraint as a consequence for perceived violations of minor school rules — such as uniform violations.

2.  Plaintiff A.M. represents all school children who attend Capital City Alternative School in the Jackson Public Schools and who are subject to Defendants' unconstitutional policies, customs, and practices of shackling children to railings, poles, chairs, bus seat legs, and other fixed objects for long periods of time for violations of minor, non-criminal school rules. As a result of JPS policy, Plaintiff A.M. has spent entire school days shackled to a railing because he left his belt at home or because he wore shoes that, in the eyes of JPS officials, were the wrong color. The experiences of A.M. are not isolated incidents. Numerous other children have spent their school days handcuffed and shackled to poles because they failed to comply with the dress code or were alleged to have talked back to a teacher. These abuses result directly from Defendants' policy, custom and practice of routinely imprisoning students for minor, non-criminal infractions in callous disregard for their rights and safety.

3.  Plaintiff A.M., individually and on behalf of the Plaintiff class, which is composed of all students who now attend or who will in the future attend Capital City Alternative School, seeks declaratory, preliminary and permanent injunctive relief requiring that the Defendants cease their unlawful policies, practices, and customs.

### JURISDICTION AND VENUE

4.  This cause of action arises under the Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983. Jurisdiction in this Court is proper pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

2

5. Venue in this Court is proper under 28 U.S.C. § 1391(b), as a "substantial part of the events or omissions giving rise to the claim[s] occurred" in this district.

## PARTIES

**REPRESENTATIVE PLAINTIFF**

6. Plaintiff A.M. is sixteen years old and is currently enrolled at Capital City Alternative School, a school operated by Jackson Public Schools. A.M. completed the 8th grade at Capital City Alternative School during the 2010-2011 school year, and he will be required to continue at Capital City Alternative School at the start of the next school year. A.M. appears in this action by and through his mother, Jeannette Murry. At all times relevant to this complaint, he was enrolled in Capital City Alternative School.

**DEFENDANTS**

7. Defendant JACKSON PUBLIC SCHOOLS BOARD OF TRUSTEES ("School Board") is a seven-member, appointed legal body vested with "such powers as may be reasonably necessary to carry out" the organization and operation of Jackson Public Schools. Miss. Code Ann. § 37-7-301. The School Board has "general control and supervision of all matters pertaining to [Jackson Public Schools]," Jackson Public Schools, *School Board Policy ABC: Board of Trustees Legal Status*, and is responsible for establishing guiding policies and evaluating the results achieved through these policies in light of the district's goals. Jackson Public Schools, *School Board Policy ABA*. The School Board has the duty to "visit schools in the district, in their discretion, in a body for the purpose of determining what can be done for the improvement of the school," Miss. Code Ann. § 37-7-301(f). State law requires the School Board to "adopt a comprehensive local school district school safety plan" and to update this plan "on an annual basis." Miss. Code Ann. § 37-3-83. The School Board is sued here in its official capacity only.

3

8. Defendant DR. LONNIE J. EDWARDS SR. is the Superintendent and Chief Executive Officer of Jackson Public Schools. As Superintendent of JPS, Defendant Edwards is responsible for "administer[ing] the schools within his district and...implement[ing] the decisions of the school board." Miss. Code Ann. § 37-9-14(1). Defendant Edwards is charged with applying school board policy and is "held accountable for the effective administration and supervision of the entire school system." Jackson Public Schools, *School Board Policy ABA: Board of Trustees Authority*. Under state law, Defendant Edwards is required to "visit the schools of his school district in his discretion, and to require the assistant superintendents, principals and teachers thereof to perform their duties as prescribed by law." Miss. Code Ann. § 37-9-14(2)(l). As Superintendent, Defendant Edwards "has the overall responsibility for the safety program of the district." Jackson Public Schools, *School Board Policy EBA: Safety Programs*. Defendant Edwards is sued here in his official capacity only.

9. Defendant GLENN DAVIS is the Interim Director of Security of Jackson Public Schools. As Director of Security, Defendant Davis is responsible for "administer[ing] policies and procedures related to safety and security" throughout Jackson Public Schools and is charged with the selection, training and evaluation of all school security personnel in the district. Jackson Public Schools, *Job Description for Position N0895 (Director, Security)*. Defendant Davis is sued here in his official capacity only.

10. Defendant MARIE HARRIS is an employee of Jackson Public Schools and is the school principal of Capital City Alternative School. In her capacity as principal, Defendant Harris is "the chief administrator and instructional leader of [Capital City Alternative School]," and "all personnel assigned to the building [are] directly responsible to [Defendant Harris]." Jackson Public Schools, *School Board Policy CEC: School Building Administration*. As principal, Defendant

Harris is responsible for "supervis[ing] the safety program for [her] school." Jackson Public Schools, *School Board Policy EBA: Safety Programs*. Defendant Harris directly supervises the school safety officers at Capital City Alternative School. *See* Jackson Public Schools, *Job Description for Position N4901 (Safety Officer, School)*. She is sued here in her official capacity only.

11. Defendant BOBBY WALDEN is an employee of Jackson Public Schools and is an assistant principal of Capital City Alternative School. He is sued here in his official capacity only.

12. Defendant FRANKLIN MCKEE is an employee of the Jackson Public Schools and is a school safety officer at Capital City Alternative School. Upon information and belief, Defendant McKee is not a commissioned law enforcement officer and does not have law enforcement authority. He is sued here in his official capacity only.

13. Defendant STACEY GREENWOOD is an employee of the Jackson Public Schools and is a school safety officer at Capital City Alternative School. Upon information and belief, Defendant Greenwood is not a commissioned law enforcement officer and does not have law enforcement authority. She is sued here in her official capacity only.

## CLASS ACTION ALLEGATIONS

14. Plaintiff A.M. brings this action on behalf of himself and all other students who now or in the future will attend Capital City Alternative School, pursuant to Federal Rule of Civil Procedure 23(a) and (b)(2).

15. This action satisfies all four requirements of Rule 23(a):

      a. *Numerosity:* This class is so numerous that joinder of all class members is impracticable. Capital City Alternative School has a student population of approximately 400-500 students at any given time. Capital City Alternative

School is the only alternative school in the district that serves students in grades 4 through 12, and there are about 20,000 students enrolled in these grades in Jackson Public Schools. Students who are sent to Capital City Alternative School enroll there for periods of time between ten days and a year or longer. Because of the nature of the school as a short-term placement, students transfer in and out frequently between Capital City and other schools in the district. The class also includes students who will attend this school in the future whose identity cannot be determined at the present time. Fed.R.Civ. P. 23(a)(1).

b. *Commonality*: There are questions of law and fact common to all members of the class, including, but not limited to, the unconstitutional seizure policies and practices to which Defendants routinely subject students at Capital City Alternative School. Fed.R.Civ. P. 23(a)(2).

c. *Typicality*: The claims of the named Plaintiff are typical of those of the Plaintiff class. As a result of the Defendants' policies and practices, students, including the named Plaintiff and other members of the class, are unlawfully seized, handcuffed, and shackled to a pole or other fixed objects for very minor violations of school rules that do not justify this intrusion, which is patently unreasonable in scope. Fed.R.Civ. P. 23(a)(3).

d. *Adequacy of Representation*: The named Plaintiff will fairly and adequately represent the interests of the class, and has no interests in this matter that are antagonistic to the class members. This Plaintiff has a strong personal interest in the subject matter of the lawsuit and is represented by experienced counsel with expertise in civil rights and class action litigation. Fed.R.Civ. P. 23(a)(4).

16. Class-wide declaratory and injunctive relief is appropriate under Rule 23(b)(2), because Defendants have acted on grounds generally applicable to the class in that Defendants' policies and practices of violating students' constitutional rights apply to the class as a whole.

## STATEMENT OF FACTS

17. School safety officers at Capital City Alternative School routinely handcuff students to fixed objects for extended periods of time as punishment for non-criminal violations of school rules. School administrators, including Principal Harris and Assistant Principal Walden, frequently direct the school safety officers to do this for a variety of infractions, including dress code violations.

18. Children as young as nine years old are often taken to the school gym, where they are handcuffed to a stairway railing and left alone for hours at a time. Youth, some with known medical and mental health conditions, are regularly shackled and left without supervision or monitoring, thus severely endangering their health and well being.

19. Staff members at Capital City Alternative School treat youth in a demeaning and excessively punitive and harmful manner. Staff members sometimes refuse to release children from these restraints to eat lunch or to use the bathroom. As a result, youth often must eat meals while still handcuffed to a pole or other fixed objects. Staff members routinely leave students in handcuffs that are too tight, causing youth excessive pain and leaving visible marks and bruises on their wrists. Upon information and belief, other school employees passing by or through the gym area can hear children calling out and asking for the handcuffs to be loosened or to use the restroom, without any response from safety officers or administrators.

20. Staff members at Capital City Alternative School leave students shackled to a pole for hours as punishment for violations of school rules even though this is in clear contravention of

Board policy of Jackson Public Schools School. Board policy states that physical restraint, including handcuffs, could only be used if a student was "an imminent danger" to himself or others or destroying property, that restraint should immediately cease when "compliance is met and the student is no longer a danger to himself and/or others," and that "[u]nder absolutely no circumstances will restraint techniques be used as punishment." Jackson Public Schools, *School Board Policy JDHAB: Student Restraint Policy.*

21. Upon information and belief, administrators punish staff members who attempt to intervene in this inhumane treatment or to meet the basic human needs of these children. Staff members have been informally reprimanded for providing food for children who missed meals while they were in physical restraints.

22. This type of seizure is excessively intrusive and unreasonably subjects youth to a substantial likelihood of emotional and physical injury. It is well documented that children who are subjected to excessively intrusive seizures suffer injuries that can last a lifetime. According to a report issued by national experts on the practice of using fixed restraints[1] on youth, children who have been subjected to restraints "describe these events as punitive and aversive, leaving lingering psychological scars. Children restrained...report recurrent nightmares, intrusive thoughts, avoidance behaviors, enhanced startle response...even years after the event. [These practices]...may evoke feelings of guilt, humiliation, embarrassment, hopelessness, powerlessness, fear and panic." Sue Burrell, *Moving Away From Hardware: The Juvenile Detention Alternatives Initiative Standards on Fixed Restraint* 2 (Feb. 2009), http://www.jdaihelpdesk.org/Docs/Documents/MovingAwayFromHardware.pdf (quoting Protection and Advocacy, Inc., *Restraint and Seclusion in California Schools: A Failing Grade* 22-

---

[1] "Fixed restraint" refers to attaching a child's hands or feet to a fixed object, such as a piece of furniture. Sue Burrell, *Moving Away from Hardware: The Juvenile Detention Alternatives Initiative on Fixed Restraint* 1 (Feb. 2009), http://www.jdaihelpdesk.org/Docs/Documents/MovingAwayFromHardware.pdf.

23 (June 2007)). After being subjected to this practice, youth, including Plaintiff A.M., feel embarrassed and humiliated. Some children are left afraid to go to school, out of fear of being subjected to unreasonable and excessive restraint again.

23. Fixed restraints are especially physically dangerous. Studies done in institutional settings have associated fixed restraints with a number of deaths. In 2000, the United States General Accounting Office found a variety of dangers such as "restraint-related asphyxiation, strangulation, cardiac arrest, chocking and aspiration" and concluded that "children are at a higher risk of injuries or death when seclusion or restraint are used." *Id.* at 2. In 2009, the General Accounting Office found a number of instances in which children died or suffered serious injuries after being subjected to restraints in educational settings. United States General Accounting Office, *Seclusions and Restraints: Selected Cases of Death and Abuse at Public and Private Schools and Treatment Centers* (2009).

24. Despite the known dangers of this unconstitutional practice, custom and policy, school officials at Capital City Alternative School act with impunity. That this practice occurs is well known amongst the staff at Capital City Alternative School and is candidly discussed between them. Administrators freely tell school safety officers to take children "to the rail" in front of students and other staff members. This happens so frequently and openly that parents visiting on other business during school hours have seen children sitting quietly while handcuffed to objects.

25. On April 15, 2011, attorneys from the Southern Poverty Law Center sent a letter detailing the misuse of physical restraints at Capital City Alternative School to a number of officials at Jackson Public Schools, including to the members of the School Board and to the Superintendent, and asking that this abuse be immediately stopped. On April 25, 2011, an attorney for Jackson Public Schools informed Southern Poverty Law Center that it was "investigating the allegations

9

contained in your letter" and that the school district had "reminded its administrative staff at Capital City Alternative School to comply with the Board Policy" on the use of restraints. Upon information and belief, the Jackson Public Schools School Board, Superintendent, and Director of Security have taken no action to address the misuse of restraints by their employees at Capital City Alternative School, and youth continue to be subjected to this unlawful policy, custom and practice.

### Capital City Alternative School

26. Capital City Alternative School is a school within the Jackson Public Schools "designed to serve as an alternative for students in grades 4-12 who have been suspended/expelled from Jackson Public Schools for 10 days or longer." Website of Capital City Alternative School, http://ccas.jpsms.org (last visited May 5, 2011).

27. The state legislature created alternative schools in Mississippi in the early 1990s in an attempt to ensure that "students [will] continue to receive an education after disciplinary problems" and to reduce the dropout rate among these students. *In the Interest of T.H.*, 681 So. 2d 110, 115 (Miss. 1996). According to the Mississippi Department of Education (MDE), the mission of alternative schools "is to promote academic success, modify behavior, and facilitate employability and functional skills attainment…in an environment that differs from the traditional school setting and offers a more conducive setting to learning." Mississippi Department of Education, Office of Compulsory School Attendance Enforcement, Alternative Education/GED and Counseling, *Alternative Education Guidebook* 5 (2010). These schools should, "[t]hrough ongoing direct instruction, guidance, and monitoring," provide students with support "with the goal of returning the student to a comprehensive school environment with the necessary abilities to function therein." *Id.* Capital City Alternative School describes its goal as being to provide "an educational

setting appropriate to the needs of students" by, for example, "developing positive self-concepts through programmatic offerings, which provide a measure of success," "address[ing] the social, emotional, and behavioral barriers that impede academic success," and "creat[ing] a climate where students feel safe in the educational environment." Website of Capital City Alternative School, http://ccas.jpsms.org (last visited May 5, 2011).

28. Since the establishment of alternative schools in the state, a number of reports and evaluations have found serious problems with alternative schools throughout Mississippi and within Jackson Public Schools in particular. *See* American Civil Liberties Union (ACLU), *Missing the Mark: Alternative Schools in the State of Mississippi* (2009); Louis Armstrong and Rims Barber, *An Uneven Start: A Report on Alternative Education in Mississippi* (1996). These concerns included: that minority children are disproportionately sent to alternative schools; that students who are "unwanted" at their regular schools were pushed out to the alternative schools; that students are not receiving quality education services at these schools; that these schools fail to help students return to mainstream schools; and that there is a lack of transparency surrounding alternative schools. *See* ACLU, *Missing the Mark, supra*, at 17; Armstrong & Barber, *An Uneven Start, supra*, at 1. In 2009, one independent report found that in Jackson Public Schools, the referral rate to alternative school "among African American students (5.9 per 1000) was nearly six times that among white students (1.1 per 1000)." ACLU, *Missing the Mark, supra*, at 29. Youth in the school district were likely to be sent to the alternative school for minor offenses, not for engaging in dangerous behavior. *Id.* at 48. This report also described "Jackson's Capital City Alternative School as having an especially punitive atmosphere," enforcing "its zero tolerance policy 'to the utmost degree,'" and using this policy "to deliberately push out challenging and 'undesirable' students." *Id.* at 43.

### *Experiences of Individual Students*

Plaintiff A.M.

29. Plaintiff A.M. is a sixteen-year-old boy, who was enrolled in the 8th grade during the 2010-2011 school year, and who currently attends Capital City Alternative School. He has a history of asthma, Attention Deficit Hyperactivity Disorder, and seizures. During the first week of April, 2011, school officials repeatedly handcuffed Plaintiff A.M. to a pole and left him there unsupervised for hours at a time.

30. Every day, when students arrive at school, all students are required to go through a metal detector and/or are subjected to a pat-down search by JPS school safety officers. Students have to remove their shoes. Their uniforms, including their belts and shoes, are also inspected.

31. On or about Friday, April 1, 2011, A.M. went to school without a belt. When he arrived at school, A.M. was told to go to In-School Suspension for being in violation of the school dress code.

32. While A.M. was on his way to the In-School Suspension room, a school counselor tried to give him a replacement belt to enable him to go to his regular classroom, but Assistant Principal Walden stopped the counselor and told her not to give A.M. a belt. Upset that he would not be able to go to class, A.M. verbally protested to Assistant Principal Walden. A.M. was not physically aggressive and did not threaten anyone.

33. Assistant Principal Walden directed JPS School Safety Officer McKee to take A.M. to the school gym and handcuff him there.

34. School Safety Officer McKee took A.M. to a small area in the school gym, located next to the stairs leading up to the stage, and handcuffed A.M. to the railing of the stairs. He placed one cuff onto A.M.'s wrist and secured the other cuff to the railing.

12

35. The handcuffs were tight and hurt A.M.'s wrist. A.M. told School Safety Officer McKee, but School Safety Officer McKee did not do anything to relieve the pain.

36. A.M. was left alone, handcuffed to the railing, for the remainder of the school day. During this time, A.M. was forced to be idle and was denied the opportunity to complete his schoolwork or gain any educational benefit. A.M. was isolated from his peers and school staff, though he was visible to other students and staff and he suffered extreme humiliation and anguish because they saw him handcuffed to a pole.

37. When A.M. had to use the bathroom, he had to wait until he heard people nearby and call out to them to get their attention. On several occasions, School Safety Officer Greenwood heard him and removed the handcuffs to allow him to go the bathroom. After he used the bathroom, despite the fact that A.M. was entirely compliant, School Safety Officer Greenwood replaced the handcuffs and shackled A.M. to the same pole again. These short bathroom trips were the only time A.M. was released from handcuffs.

38. A.M. was not released from the handcuffs to eat lunch. Instead, a School Safety Officer brought food to him to eat in the gym. A.M. was forced to eat his meal while still handcuffed to the railing.

39. A.M. was finally released from the handcuffs at the end of the school day, when the buses came to take students home. A.M. was allowed to ride home on his regular school bus, along with the other children.

40. A.M. was subjected to similar treatment three more times over the next week for minor infractions, such as not wearing shoes allowed by the student dress code or not having on a belt.

41. On each of these days, in the morning shortly after A.M. had arrived at school, School Safety Officer McKee took A.M. to the same place in the gym and handcuffed him to the pole, at

13

the direction of Assistant Principal Walden. A.M. was left there unsupervised for most or all of the school day and was released from the handcuffs at the end of the day to ride the bus home.

42. A.M.'s mother was not notified or called on any of these occasions, nor was she asked to bring him a belt or another pair of shoes. Upon information and belief, A.M. was not given a disciplinary notice and did not have any infraction recorded in his disciplinary record on these occasions. Upon information and belief, the police were not called and A.M. was not charged with any offenses as a result of these incidents.

43. A.M. has been subjected to this treatment during previous school years as well. A.M. has been handcuffed to the pole in the gym at Capital City multiple times each school year since he was in the fourth grade.

44. On several of these past occasions in previous school years, Principal Harris directed the school security personnel to handcuff A.M. to an object as punishment for minor misbehavior. A.M. also witnessed Principal Harris directing JPS school security personnel to "take [other students] to the pole."

45. This excessive use of restraints was not designed to reduce or curb misbehavior or prevent violence by A.M. It was simply intended as degrading and vindictive punishment. At no point during the entire initial contact or while he was restrained did A.M. pose a threat of bodily harm or engage in violent conduct. Indeed, the only school infractions that he was alleged to have committed were dress code violations and talking back. Handcuffing him and shackling him to a pole for multiple hours on multiple days was unreasonable and unjustified both at inception and in scope.

46. A.M. fears that school safety officers will again handcuff him to a pole and leave him there. In addition to A.M. being subjected to this treatment, he has also seen other students handcuffed to

14

the same railing in the gym at different times. A.M. felt humiliated in front of his peers for being handcuffed to a pole at school, and he dreads going to school each day, not knowing if they will handcuff him.

47. An objectively reasonable school administrator and school safety officer would know that handcuffing a child, especially a child with known emotional and medical conditions, to a rail for hours over multiple days solely as punishment for minor misconduct is unlawful and unreasonable.

48. The Defendants knew that this practice was unreasonable and against clear district written policy which stated that physical restraint, including handcuffs, could only be used if a student was "an imminent danger" to himself or others or destroying property, that restraint should immediately cease when "compliance is met and the student is no longer a danger to himself and/or others," and that "[u]nder absolutely no circumstances will restraint techniques be used as punishment." Jackson Public Schools, *School Board Policy JDHAB: Student Restraint Policy*.

49. The Defendants knew that this practice was unreasonable and was not permitted as a disciplinary option or behavioral/intervention strategy for any type of misconduct under the district's authorized plan for student disciplinary action. *See* Jackson Public Schools, *Code of Student Conduct, 2010-2011* 16. The Defendants also knew that the Code of Student Conduct specified the authorized types of disciplinary action for minor misbehavior, and that these authorized actions included punishments such as warnings, parent conferences, and in-school suspension, but not shackling students to objects. *Id.* at 8.

50. Even though this practice was not done pursuant to a written policy of the JPS School Board, the practice of shackling students to poles and other fixed objects as punishment for minor misbehavior is so widespread and persistent as to constitute an official policy or custom of the school district. JPS school administrators and security personnel have subjected a number of

15

children to this practice frequently and over the course of multiple years. School administrators, including the principal and vice principal, often directly order that security guards shackle students to objects. In fact, the school administrators do this frequently enough that they have developed and utilize a short-hand vernacular to refer to the practice ("take [the child] to the pole"), which is understood clearly by the school security guards without any need for explanation. The practice is widespread and persistent enough that other school personnel considered it commonplace, well-settled and ordinary; even though they frequently observe students shackled to the railing in the gym, they act as if this is permissible and do not intervene or report the occurrence.

51. The experiences of Plaintiff A.M. are not isolated or anomalous incidents. Instead, they are representative of widespread and frequent actions by school security officers, at the explicit direction or with the complicity of school administrators. In addition to Plaintiff A.M., countless other students enrolled at Capital City Alternative School have been victims of the challenged policies and practices. This practice has happened so frequently, and without correction or intervention by the school district, as to constitute a custom that fairly represents the policy of the school district.

N.R.

52. N.R. is a fourteen-year-old boy who was enrolled in the 7th grade in Jackson Public Schools during the 2010-2011 school year. N.R. attended Capital City Alternative School for several months during the 2010-2011 school year and attended that school at all times relevant to the events described below in Paragraphs 53 to 64.

53. JPS safety officers and administrators at Capital City Alternative School have subjected N.R. to unreasonable and excessive handcuffing on multiple occasions.

16

54. In the winter or spring of 2011, N.R. was handcuffed to a pole in the school's gym for multiple hours, with no supervision as a consequence for minor school rule violations.

55. During his homeroom class at the start of the day, N.R.'s teacher confiscated a stocking cap from N.R. Upset, N.R. refused to do his schoolwork. The teacher called a school safety officer to the room, and told the school safety officer that N.R. had a cap and was refusing to do his work.

56. The school safety officer came into the classroom, grabbed N.R. and led N.R. out of the classroom and into the hallway, where they encountered Principal Harris. Principal Harris directed the school safety officer to "lock [N.R.] to the pole."

57. The school safety officer took N.R. to the gym and handcuffed N.R. to the railing on the stairs by the stage. The school safety officer secured one handcuff to N.R.'s wrist and the other cuff to the railing. The school safety officer told N.R. that he was handcuffed because N.R. had thrown his school papers on the ground.

58. N.R. was left shackled to the pole largely without supervision until the afternoon. N.R. slept for part of this time, yet was not released from the handcuffs. During the day, multiple school officials saw him handcuffed there but did nothing to remove the handcuffs. These included Principal Harris, Assistant Principal Walden, School Safety Officer Greenwood, School Safety Officer Rice, and School Safety Officer McKee. No one remained with N.R. to visually supervise N.R. while he was handcuffed and there were no video cameras in the area where N.R. was held.

59. Because of the lack of supervision, when N.R. had to use the restroom while he was handcuffed to the railing, he had to yell to get the attention of a school safety officer in order to ask to be released to use the restroom. However, when N.R. asked her, School Safety Officer Greenwood did not release him and N.R. was not allowed to use the toilet.

60. School Safety Officer McKee brought N.R. his lunch while he was handcuffed to the railing, but did not release N.R. from the handcuffs. N.R. was forced to eat his lunch while still handcuffed to the railing.

61. When N.R. was finally released from the handcuffs in the afternoon, there were marks left on his wrist. N.R. showed the marks to Assistant Principal Walden, but Assistant Principal Walden did not get him medical attention or care.

62. After being released from the handcuffs, N.R. was allowed to go home. Upon information and belief, N.R. was not arrested or charged with any crime as a result of this incident. When he returned to school, N.R. was given In-School Suspension.

63. School officials have subjected N.R. to this excessive and unlawful use of restraints at least five times during this school year. On prior occasions, School Safety Officers McKee and Greenwood have handcuffed him to the same railing and left him there alone. They told him in these incidents that he was being handcuffed to the pole for non-criminal violations of school rules, including wearing shoes that were the "wrong color," having mismatched shoelaces, or not bringing a parent feedback sheet.

64. N.R. has seen a number of other youth handcuffed to a pole in the same manner that he was, including Plaintiff A.M.

R.S.

65. R.S. is a fifteen-year-old girl who was enrolled in the 8th grade in Jackson Public Schools during the 2010-2011 school year. R.S. attended Capital City Alternative School for multiple months early in the 2010-2011 school year and at all times relevant to the events described below in Paragraphs 66 to 74.

66. R.S. has been subjected to unreasonable and excessive handcuffing by JPS school safety officers and administrators at Capital City Alternative School on multiple occasions.

67. In January or February of 2011, R.S. was unreasonably handcuffed without supervision to a stairway railing in the Capital City Alternative School gym for multiple hours for minor misbehavior.

68. In the morning, R.S. loudly called out the name of a friend in the hallway, trying to get her friend's attention. Campus Enforcement Officer Elijah Paige heard R.S. and told her to "shut up." R.S. talked back to him, saying "who are you talking to? I ain't your child." R.S. was not physically aggressive and did not threaten anyone.

69. In response to R.S. talking back, Campus Enforcement Officer Paige began leading R.S. to the gym. On the way there, they encountered Principal Harris, who asked Campus Enforcement Officer Paige where he was taking the student. Campus Enforcement Officer Paige informed Principal Harris that he was taking R.S. "to the stairway." Principal Harris allowed Campus Enforcement Officer Paige to continue to the gym with R.S.

70. Once in the gym, Campus Enforcement Officer Paige took R.S. to the small area next to the stage and handcuffed her to the rail on the stairway. He put a handcuff on one of her wrists and secured the other handcuff to the rail.

71. After handcuffing her, Campus Enforcement Officer Paige left R.S. alone without supervision until lunchtime. During that time, R.S. was unable to get anyone's attention to ask to be released to use the bathroom. While she was handcuffed to the rail, R.S. sat on the stairs and had nothing to do.

72. At lunchtime, Campus Enforcement Officer Paige released R.S. from the handcuffs. R.S. was allowed to join the other students in the cafeteria and finish the school day in her normal classes.

73. At no point during this incident did R.S. present a danger to herself or anyone else at Capital City Alternative School. This restraint was both unreasonable at the time that it was applied and in its duration. Upon information and belief, R.S. was not given a disciplinary notice and did not have any infraction recorded in her disciplinary record for this incident. Upon information and belief, R.S. was not arrested or charged with any crime as a result of this incident. R.S.'s mother was never informed or contacted about this incident.

74. R.S. has been subjected to this type of unreasonable restraint two or three additional times during the 2010-2011 school year, for similar incidents in which she was "loud." R.S. has seen other students subjected to similar restraint in this manner for minor misbehavior multiple times. R.S. has witnessed school administrators swear at students, using language such as "get your black ass [somewhere]," and when students respond using similar language, the administrators tell security guards to take the students to the gym and handcuff them to the pole as punishment for cussing.

M.D.

75. M.D. is a 14-year-old boy who is currently enrolled in the 8th grade in a school district outside of Mississippi. M.D. was enrolled in Jackson Public Schools during the 2009-2010 school and attended Capital City Alternative School for part of that school year and at all times relevant to the events described below in Paragraphs 76 to 85.

76. During the time that M.D. was attending Capital City Alternative School, school officials subjected M.D. to unreasonable and excessive use of handcuffs and force.

77. One day, in the spring semester of 2010, a security guard told M.D. to take off his shoes to be searched at the start of a school day. M.D. did not want to do so and, upset, went to class.

78. As punishment for refusing to take off his shoes, a school safety officer came to M.D.'s classroom, dragged M.D. to the gym by his belt, and shackled M.D. to a pole by the staircase leading to the stage. The school safety officer put handcuffs on M.D.'s arm and leg and shackled the handcuffs to the pole. M.D. told the school safety officer that the handcuffs were too tight and were hurting him, but the school safety officer did nothing to loosen the handcuffs or to otherwise relieve his pain.

79. The school safety officer left M.D. alone and unsupervised while shackled to the pole for more than an hour. During this time, a school official came by this area briefly one time. School officials did not provide M.D. with school work while he was shackled to the pole.

80. While M.D. was shackled to the pole, he had to go to the bathroom. Because no one was supervising him while he was shackled, he was forced to yell to try to get the attention of a school safety officer to ask to go to the bathroom. Even though M.D. yelled to try to get someone's attention, no one came to check on him and he was not allowed to go to the bathroom.

81. A school official called M.D.'s mother and asked her to pick up her child. When M.D.'s mother arrived at the school, Principal Harris told her that M.D. was in the gym, but did not allow M.D.'s mother to go get him from this location.

82. More than an hour after M.D. had been shackled to the pole, a school safety officer returned and told M.D. that his mother had arrived to pick him up. The school safety officer removed the handcuffs from M.D. and walked with him to the office to meet his mother.

83. Upon information and belief, M.D. was never arrested and no youth court charges were filed against M.D. as a result of this incident.

84. When his mother saw M.D., she immediately observed that he had new bruises and scratches on his wrist that he did not have when he had gone to school that morning. M.D.'s mother asked Principal Harris what had happened. Principal Harris told M.D.'s mother that he "had to be restrained" and the school officials "had to hold him down." Principal Harris did not tell M.D.'s mother that he was handcuffed.

85. In frustration and anger after talking to Principal Harris, M.D.'s mother spoke with other support staff working in the Capital City administrative office, and asked how to complain about how Principal Harris had treated her and her son. No one would provide her with this information.

C.K.

86. C.K. is a fifteen-year-old boy who was enrolled in the 7th grade in Jackson Public Schools during the 2010-2011 school year. C.K. attended Capital City Alternative School for several months in the 2010-2011 school year and at all times relevant to the events described below in Paragraphs 87 to 95.

87. C.K. has been subjected to unreasonable and excessive handcuffing by JPS security guards and administrators at Capital City Alternative School on multiple occasions.

88. In the late winter or early spring of 2011, C.K. was unreasonably handcuffed to a stairway railing in the gym for multiple hours for minor misbehavior, without any supervision.

89. In a class early in the day, C.K. was dancing and rapping in his classroom. Assistant Principal Walden came into the classroom and told C.K. to stop engaging in this behavior. C.K. complied with this directive and stopped. Assistant Principal Walden said to C.K., "Boy, you look like you got an attitude," and told him to go to the office. C.K. obeyed this command.

90. At Assistant Principal Walden's direction, School Safety Officer Greenwood and another security guard took C.K. from the office to the gym, where they handcuffed him to the railing next

to the stage. C.K. told the guards that the handcuffs were tight and causing pain, and he asked for them to be loosened, but the guards refused to do so.

91. C.K. was left alone in this area without supervision for several hours before he was released from the handcuffs.

92. After several hours, a security guard removed C.K. from the handcuffs and he was allowed to go home with his mother. When the handcuffs were taken off, C.K. had visible marks on his wrist caused by the handcuffs.

93. Upon information and belief, the police were not called and C.K. was not arrested or charged with any offense as a result of this incident.

94. C.K. was subjected to this unreasonable restraint approximately five to six times during the 2010-2011 school year, for similar minor misconduct. On previous occasions, Principal Harris directed a JPS school security guard to handcuff C.K. to the pole.

95. C.K. has frequently witnessed many other children handcuffed in this manner for minor misbehavior at Capital City Alternative School.

### CAUSES OF ACTION

96. A.M. and the proposed class incorporate by reference all of the above factual allegations to support the following claim:

### Count One: Declaratory and Injunctive Relief to Protect Plaintiffs' Fourth and Fourteenth Amendment Rights to be Free from Unreasonable and Excessive Seizures

97. By their foregoing actions and inactions, Defendants School Board, Edwards, Davis, Harris, Walden, McKee and Greenwood are liable pursuant to 42 U.S.C. § 1983 for sanctioning and enforcing a policy, practice and custom of unreasonably and excessively seizing and handcuffing school children, including A.M., to fixed objects for long periods of time for non-

criminal violations of school rules in violation of the Fourth and Fourteenth Amendments to the U.S. Constitution.

98. By their foregoing actions and inactions, Defendants School Board, Edwards, Davis, and Harris are liable for failing to train, supervise and monitor the use of restraints on school children, including A.M., in deliberate indifference to repeated and ongoing violations of their rights under the Fourth and Fourteenth Amendment to the U.S. Constitution.

99. By their foregoing actions and inactions, Defendants Harris and Walden are liable pursuant to 42 U.S.C. § 1983 for directing the unreasonable and excessive seizure and handcuffing of school children, including A.M., to objects for long periods of time for non-criminal violations of school rules in violation of the Fourth and Fourteenth Amendments to the U.S. Constitution.

100. By their foregoing actions and inactions, Defendants McKee and Greenwood are liable pursuant to 42 U.S.C. § 1983 for unreasonably and excessively seizing and handcuffing school children, including A.M., to objects for long periods of time for non-criminal violations of school rules in violation of the Fourth and Fourteenth Amendments to the U.S. Constitution.

101. A.M. and the proposed class are entitled to a permanent injunction prohibiting the Defendants from engaging in the unlawful conduct described here, in order to remedy these constitutional violations and to ensure that the constitutional rights of A.M. and the proposed class are protected in the future.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff respectfully requests this Court grant the following relief:

1.    Assume jurisdiction over this matter;

2.    Certify this action as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(2);

24

3.    Declare that the acts and omissions of all Defendants violate the U.S. Constitution;

4.    Enter a permanent injunction requiring the Defendants, their agents, employees and all persons acting in concert with them to cease their unconstitutional and unlawful practices;

5.    Award the Plaintiffs the costs of this lawsuit and reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

6.    Grant any other relief the Court shall deem just and proper.


Dated this the 8th day of June, 2011.

Respectfully submitted,

_____

POONAM JUNEJA, MS Bar No. 103181
poonam.juneja@splcenter.org
JODY E. OWENS, II, MS Bar No. 102333
jody.owens@splcenter.og
SHEILA A. BEDI, MS Bar No. 101652
sheila.bedi@splcenter.org
CORRIE COCKRELL, MS Bar No. 102376
corrie.cockrell@splcenter.org
Mississippi Youth Justice Project
Southern Poverty Law Center
921 N. President Street, Suite B
Jackson, Mississippi 39202
601-948-8882 (telephone)
601-948-8885 (fax)

Attorneys for Plaintiff.